It pleases the Court, James Fife of Federal Defenders, on behalf of the appellant, Mr. Valdovinos. I'd like to reserve two minutes for rebuttal, if that's possible. The government concedes that admission of the certificate of nonexistence of record was constitutional error, but it also claims that admission of this document, which it repeatedly argued to the jury sufficed to prove the essential element of lack of consent, was harmless beyond a reasonable doubt. But the record below shows that, rather, the admission of the CNR had a reasonable possibility that it might have contributed to the conviction, and so it requires reversal under Chapman. What did the CNR add to the testimony by, is it Agent Watt? Woody. Woody? Yes. Who personally testified to her search of the A file and electronic databases and testified to the jury that she found no evidence of his permission to do it? There are a number of reasons why the search testified to in the CNR was more influential, was more likely to have influenced the jury's verdict than Agent Woody's. The CNR simply says that after a diligent search of the record, we find none. No, that's not correct, Your Honor. Okay, what does it say? It says more than that. What does it say? It says the CNR made a more thorough search because it searched different permutations of the defendant's name. It searched for aliases. It searched for different dates of birth. Those are all things that are testified to on the face of the CNR, but those are things which Agent Woody did not do, or at least did not testify to, having made those searches. She simply said she did a database search using these two databases. So the distinction is she didn't specify which databases she searched and the fact that she didn't use variations of the spelling of his name. That's partially correct. She did specify which databases she searched, but she didn't specify that she did the thorough search, which the CNR testifies to, searching various permutations of the name and dates of birth. And was she cross-examined on that fact? She was asked about what the search was, but there was simply no testimony stating the scope of her search. So there was no cross-examination even though you had the opportunity to make it? There was no direct or cross-examination that I know of that asked about how she actually went about that particular search. Okay, and doesn't the Confrontation Clause require the opportunity to cross-examine? That's correct. Even if the defendant doesn't take advantage of it, doesn't that go into the investment of harmless error? You're absolutely right, Judge Tolman, but we're not challenging the confrontation of Agent Hootie. We're challenging the confrontation of the CNR. But I guess the point I'm trying to weigh here is how important was the CNR, given the fact that you had a live custodian subject to cross-examination who could have been asked all of the impeaching questions that you're urging us we should find as a basis for reversal, but no such questions were posed to the person who could have acknowledged, gee, I didn't think about that, gosh, I didn't use a different spelling of his name, none of that. Your Honor, I don't think, for number one, the burden was on the government to show that they did an adequate, that Agent Hootie's search was sufficient to show beyond a reasonable doubt that he lacked consent. But that goes to its weight, not to its admissibility, does it not? That's correct, and we have no argument with Agent Hootie's testimony. That's certainly all right. The problem is that her testimony was nowhere as convincing an influential effect as the CNR, because as the government, take the government's own word for it, because they argued repeatedly to the jury that the CNR was authoritative, that it was done by the head of the department, of the person who's responsible for doing these searches, and that it was more reliable. Let me ask you this question. Suppose the government had not introduced the CNR, they'd simply called Agent Hootie and she testified to what she testified to. Wouldn't that be sufficient evidence to establish that element of the offense? Possibly, Your Honor, and possibly if the CNR wasn't being admitted in evidence, that the trial attorney would have made a more thorough examination of Agent Hootie. But the question is, standing alone, would Agent Hootie's testimony have been sufficient? If we believe the answer to that question is yes, then how can the admission of the erroneous CNR be harmful beyond a reasonable doubt? Because, as the Supreme Court said, expressed the standard in Chapman, is that the government has to show there is no reasonable possibility that the evidence complained of might have contributed to the conviction. That is, it has to show that there is no reasonable possibility that this CNR influenced the jury in reaching its decision. Well, let me ask the question in a different way. Did your client, as part of his defense at trial, testify or suggest that he'd ever asked for permission? There was no defense testimony. So that issue was never joined before the jury? It was totally on the basis of whether the government had sustained its burden in which it relied principally on the CNR for this particular argument. But that's a different issue. I mean, the question we're trying to assess here is the harmfulness of the error. And if the defendant never placed in issue this particular point other than to argue the evidence is insufficient, doesn't that weigh into the analysis that we must employ? I think the factors that this court has to examine are the ones that are listed in Van Aerstadtel and in this court's decision in Larson, which the government didn't address in its briefing, but which we did address in the reply. And I can run through those factors. No, I know what the Van Aerstadtel factors are. Okay. And I would say under those factors we would show that, yes, this was extremely, that the CNR was critical evidence that there should have been cross-examination on the author of the CNR because of its centrality to the government's case, because it wasn't cumulative, because of the weakness of the physical A file search and where the agent was impeached on the accuracy of the physical A file. Well, you say the agent was impeached, but the jury convicted. So don't we have to find that the agent was not impeached? No, no. Or at least that the jury disbelieved the significance of the impeaching question. No, I disagree, Your Honor. I'd say that what the jury's verdict, my argument is what the jury convicted on was on the strength of the CNR because that's what the prosecution urged repeatedly they should look to to find that essential element of consent. They said this was the authoritative search. This was the person who is the head of this department and made the search you should rely on the CNR. Yes. Other panels of this court have found harmless error under these circumstances. Can you compare the evidence in this one to those, Orozco-Acosta? And Norwood. Yes. The two cases, I'd like to plot that up, Your Honor. Vargas-Victoria as well? Sorry? Is there a Vargas-Victoria as well that found harmless error? I'm not aware of that case, Your Honor, but the two published cases I'm aware of are Norwood. These are post-Melendez-Diaz cases, Norwood and Orozco-Acosta. In Norwood, starkly distinguished because the main reason in Norwood they found harmless error, the evidence that was admitted without confrontation didn't even go to an element of the offense. So it wasn't even something the jury was required to find. So it couldn't have influenced the verdict. The other thing the court pointed to is that there were three independent lines of evidence which showed the same evidentiary point, the girlfriend's testimony, the fact that the amount of money was more than he could have earned by legitimate employment, and the fact that there was previous evidence, other evidence in the record, that Mr. Norwood was involved in drug dealing. So there was independent, three lines of independent evidence there. Orozco-Acosta, the main distinction, there were multiple admissions under oath that Mr. Orozco lacked consent. There is nothing of that nature here. Counsel, my question is really the converse, I guess. What supports you here in the situation in which there is testimony which could have been cross-examined that established the point. There was no contrary evidence, and so the jury, there was sufficient evidence apart from the evidence you challenged to support the jury's verdict. What is the case that says in those circumstances it's still harmful and prejudicial? I am relying totally on page 24 of Chapman, where it states that it's a reasonable possibility that it influenced this verdict. Okay, so under that test, there would never, there would really never, almost never be harmless error. Well, Your Honor, we all know that beyond a reasonable doubt, which is the Chapman standard, we all state over and over again, it's the highest standard this country. It's true, but you're interpreting it, it sounds as if you're interpreting it to mean if the jury could have looked to that evidence as support for its verdict, then it's prejudicial. And that is true of all of the cases that you've just, that we've just discussed where it was harmless. It's not I that states this, it's the Supreme Court in Chapman that states this. It's what the Supreme Court means that we always argue about. Right, and I think the Supreme Court means that given the fact that this is the highest standard, if it were the other way around, and we're saying did the government prove beyond a reasonable doubt, we hold them to an extremely high standard. And for a defendant to prove that there was reasonable doubt, it has to show something very credible, something very convincing that there really was no reasonable jury could have come to this conclusion. By the same token, reasonable doubt standard under Chapman means the government has to come up with something very convincing that this jury was not influenced, this verdict was not influenced by the constitutional error. Thank you. Okay, thank you. Good morning, Kyle Hoffman for the United States. I'd like to begin where counsel left off in the discussion with Judge Schroeder, and that's the question of what the standard is for harmlessness beyond a reasonable doubt. Counsel relies on Chapman, and I think Judge Schroeder has it exactly right that the cases since Chapman have interpreted the standard of harmless beyond a reasonable doubt slightly differently. And I point to Norwood 2, I'll call it, 603 Fed 3rd at 169. That was our decision on Ream again. Correct. I believe, Judge Holm, I believe you're on that now? I remember the case well. And essentially the standard there is enunciated as has the government shown that the verdict would have come in beyond a reasonable doubt in the absence of this other evidence. So it's a slightly different formulation. And I agree with Judge Schroeder that if it were in practice operationally the way that counsel has portrayed it, there would never ever be a holding of a decision as harmless beyond a reasonable doubt because there's no way to tell what a jury has focused on back in the jury box or back in the deliberation room. So I start there with the standard. Then when you look at Norwood and then Larson, another case where this court talked about how do you decide harmlessness beyond a reasonable doubt in the case of a confrontation clause deliberation, the question is was the testimony contradicted or uncontradicted? Was it cumulative or not? Was it corroborated or not? And was there an ability to cross-examine? And to tick off all those factors, they all support harmlessness beyond a reasonable doubt here. Was this testimony that there was never any application for permission to come back to the United States? Was it contradicted? I think Judge Schroeder and Judge Tolman both pointed to the fact that there was no the defendant didn't get on the stand and say back in Mexico I put in the mailbox an application for permission. There was nothing like that. There wasn't even a hint of that. So that's point one. Point two, was it corroborated? It's not just the testimony of Agent Woody that corroborates the absence of permission. It's also the circumstances of the arrest. Arrested in Vista, California, basically drunk driving, and gives a false name and false driver's license. Why? Because he's got a warning that's in the evidence that says if you come back, you're going to be in deep trouble. That's circumstantial evidence that he doesn't have permission. If he had permission, he'd just give his correct name. And then we go to Agent Woody. Is the testimony cumulative? The answer is yes. The only difference between this case and Orozco-Costa, the case that Jarvi pointed to, is it's true that there were admissions in that case. That's the only difference. Agent Woody and the CNR, they essentially say the same thing. And that's right. I disagree very much with counsel. If you look at the CNR, it doesn't say, oh, I searched under all these other aliases. It lists the aliases. But it doesn't say, oh, it says I searched the subject, and that's the subject's name. So I think there's a mischaracterization of how broad that search was. Second, Agent Woody testified, I searched under his date of birth, his name, and his A-file number. So in that sense, it's in a way more comprehensive than the CNR. And then finally, Judge Solomon again pointed this out, there was the ability to cross-examine Agent Woody. And there was no attempt to essentially impeach that search. There was an attempt to impeach. I suggest that it failed spectacularly. There was an attempt to show that, this gets into a lot of detail, attempt to show that there was a document in the A-file that belonged to another alien. But it turned out that that wasn't the case. Was it another alien or just an alias? The idea was this. Counsel pointed to, showed Agent Woody a document and said, aha, this has another, oh, actually, it may have been another alias. It had a different name. Well, we know that he used more than one name because he gave a false name to the arresting officer. I think it was a completely different alien. And I'm pointing, this is at 304, 311 in the excerpts of record and 348. And the idea that counsel was going to argue was, aha, this shows that these A-files, they can't be relied on. Documents appear in them that don't belong there. Documents that do belong there aren't there. Well, it turned out Agent Woody went back and looked at the A-file. That was the refreshing recollection. So that document never, that wasn't in the A-file. You're just wrong about your premise. So there was an attempt to impeach the A-file and the A-file custodian, and it just failed. So I suggest that, yeah, there was some cross-examination. It wasn't on the real issue, and it failed anyway. The one thing that was found was there was a typo about the number of times. Did you try to case it? Yeah, I'm sorry? Did you try to case it? I did not try to case it. I didn't, but I read the record pretty carefully. And I suggest that's what happened. So there was an inaccuracy. That was the number of times that the defendant had been removed from the United States, and the agent said it was a typo. Now, does that pertain to whether he had gotten permission? I suggest not. All the other evidence supports the proposition that he had never applied for permission to reenter. I don't know if the Court has questions on any others. Did we have any published decisions on the viability of Almavir's Taurus after Nijuan? I don't believe so. I believe Martinez-Rodriguez is 2007 and Nijuan is 2009. I know there was a case with a precise argument. I think we said it was unpublished. Montes Figueroa, I think it is. Where that precise argument was made. So we might want to publish this one on that issue. It might be worth, unless this Court wants to revisit that argument many, many, many times in the future. It might be worth publishing it. So I'd be happy to answer any further questions. Thank you. Thank you. Are there any further questions of the panel? All right. You have used your time. Oh, sorry, Your Honor. Sorry. There don't appear to be any questions. The case just argued is submitted for decision. We'll hear the next case for argument, which is United States v. Murillo-Perez.
judges: Jarvey, Schroeder, Tallman